## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DANA L. RICE-SMITH,** | : | **CIVIL ACTION NO. 1:20-CV-1473** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **MISERICORDIA CONVALESCENT** | : | |
| **HOME, d/b/a MISERICORDIA** | : | |
| **NURSING & REHABILITATION** | : | |
| **CENTER,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

Plaintiff Dana L. Rice-Smith brings claims of employment discrimination and retaliation against her former employer, defendant Misericordia Convalescent Home ("Misericordia"), pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; and the Pennsylvania Human Relations Act ("PHRA"), 43 PA. STAT. AND CONS. STAT. ANN. § 951 *et seq.* Misericordia moves for summary judgment on all claims. We will grant in part and deny in part the motion.

I.      **Factual Background & Procedural History**[1]

Misericordia is a nursing home facility located in York, Pennsylvania.  (See Doc. 35-5 ¶ 1).  Rice-Smith, a Black woman, applied for a position with Misericordia in July 2016.  (See id. ¶¶ 7, 11).  During her interview, Rice-Smith informed Misericordia's director of nursing, Michael Urban, that she has multiple sclerosis and requested to use a cane at work.  (See id. ¶ 9).  Urban relayed that, prior to interviewing Rice-Smith, he previously worked with her at a different care facility, was familiar with her performance, and knew she had become licensed as a registered nurse ("RN").  (See Doc. 35-9, Urban Dep. 14:21-15:22, 16:15-17:5).  Urban recommended that Misericordia's administrator Marion Bittner, hire Rice-Smith, and informed Bittner of Rice-Smith's request to use a cane due to her multiple sclerosis.  (See id. ¶¶ 10-12).  Bittner testified Urban was "excited" to hire Rice-Smith because he had previously worked with her.  (See Doc. 35-8, Bittner Dep. 26:7-14).

Misericordia hired Rice-Smith on August 8, 2016, as a "weekend-option registered nurse house supervisor."  (See Doc. 35-5 ¶ 15).  The parties dispute

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  M.D. PA. L.R. 56.1.  A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried.  Id.  Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts.  (See Docs. 35-5, 39-2).  To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.

whether Rice-Smith was hired "on a probationary basis."  (<u>See</u> <u>id.</u>; Doc. 39-2 ¶ 15).

Urban acted as Rice-Smith's direct supervisor.  (<u>See</u> Doc. 35-10, Rice-Smith Dep.

24:19-21; Bittner Dep. 13:17-22).  Urban, in turn, reported to Bittner.  (<u>See</u> Urban

Dep. 11:8-10).

### A.    Workplace Injury and Health-Related Absences

On October 7, 2016, Rice-Smith slipped and fell at work and injured her right

knee and right foot.  (<u>See</u> Doc. 35-5 ¶ 22).  Rice-Smith received permission for leave

due to this injury and returned to work on restricted duty the following week.  (<u>See</u>

<u>id.</u> ¶¶ 23-24).  Per Rice-Smith, her fall aggravated her multiple sclerosis.  (<u>See</u> Doc.

39-2 ¶ 24).  Rice-Smith's worker's compensation medical status report from October

13, 2016, indicates an initial impression of a right knee and foot sprain, states she

can return to work "doing modified job duties," permits "sit down work only," and

recommends she obtain a "hinged knee brace."  (<u>See</u> Doc. 35-12 at 25).

Rice-Smith attended a follow-up appointment regarding her injury in

November 2016.  (<u>See</u> Doc. 35-5 ¶ 39).  Her worker's compensation medical status

report from November 18, 2016, indicates an updated diagnosis of "contusion,"

states she can return to work "doing modified job duties," permits "4 hours of

sitting and 4 hours of standing," and allows occasional carrying, pushing, pulling,

and stooping or bending, all with a limit of 15 pounds.  (<u>See</u> Doc. 35-12 at 22).

Misericordia business records from this timeframe indicate Rice-Smith received

approval for a "temporary light duty position" that would expire on December 9,

2016.  (<u>See</u> Doc. 39-12 at 10).

On November 23, 2016, Rice-Smith requested time off from work due to a "stomach bug." (See Doc. 35-5 ¶ 41). She returned to work on November 26, but left after approximately three hours because she still felt ill. (See id. ¶ 42). The record does not indicate whether Rice-Smith worked at Misericordia between November 27 and November 30, but she again called out from work on December 1 and 2 due to illness. (See id. ¶ 44). Text messages on December 4 between Rice-Smith and Urban indicate that Rice-Smith inquired about returning to work. (See id. ¶ 46). Urban responded by stating Rice-Smith was back on the schedule and added: "We will talk tomorrow about how you are feeling and how to adjust your schedule to keep you healthy." (See Doc. 39-5 at 1).

Rice-Smith attended a final follow-up for her workplace injury on December 9, 2016. (See Doc. 35-5 ¶ 60). Medical records from that day give a final diagnosis of "contusion of right knee," note Rice-Smith's pain is a 1 out of 10, and conclude Rice-Smith is discharged "from treatment for this injury to full duty (pre-injury status)" as of that date. (See Doc. 35-12 at 20-21).

Much of the parties' factual disputes center on whether Rice-Smith's workplace injury aggravated or otherwise exacerbated her multiple sclerosis. (See, e.g., Doc. 35-5 ¶ 39; Doc. 39-2 ¶ 39). The worker's compensation medical records submitted for summary judgment do not mention Rice-Smith's multiple sclerosis diagnosis. (See Doc. 35-12 at 18-33; Doc. 39-12 at 1-53). Her December 9 follow-up notes state that Rice-Smith has "[n]umbness and tingling in either foot . . . due to another chronic health issue," but her accompanying "medical problems" list does not include multiple sclerosis. (See Doc. 35-12 at 20; Doc. 39-12 at 4).

4

**B.     Cell Phone Use Issues**

Misericordia provided Rice-Smith an employee handbook upon hiring.  (See Doc. 35-5 ¶ 4).  The handbook contains a section titled "telephone calls and messages," which admonishes: "Cell phones are to be used only during breaks and at mealtimes, may not be used in resident care or work areas, and may not be kept on your person."  (See Doc. 35-12 at 40).

The parties dispute whether Urban observed Rice-Smith using her personal cell phone during work hours in October 2016.  (See Doc. 35-5 ¶¶ 16-21; Doc. 39-2 ¶¶ 16-21).  According to Rice-Smith, Urban knew she was in the process of fostering and adopting a child, and "gave her specific permission to make personal calls." (See Doc. 39-2 ¶ 16).  Misericordia maintains Urban counseled Rice-Smith in October 2016 on her cell phone use and reminded her of Misericordia's cell phone policy.  (See Doc. 35-5 ¶¶ 16, 20).  Urban testified he was aware of Rice-Smith's adoption plans, but stated he told Rice-Smith her calls related to fostering or adoption "needed to be kept to a bare minimum."  (See Doc. 39-2 ¶ 19).

The parties also dispute whether Urban again witnessed Rice-Smith using her cell phone in December 2016.  (See Doc. 35-5 ¶ 48; Doc. 39-2 ¶ 48).  Misericordia claims Rice-Smith "took a personal telephone call at the nurses' station" while two people waited for assistance and service.  (See Doc. 35-5 ¶ 48).  Rice-Smith does not deny she took a phone call, but refers back to Urban's grant of permission for calls

related to her fostering and adoption of a child, and denies that she ignored anyone. (See Doc. 39-2 ¶ 48).[2]

### C. Other Disciplinary Issues and Termination

Misericordia's handbook contains a section on disciplinary measures, which describes and grades disciplinary violations from Group I to Group IV. (See Doc. 35-12 at 41-42). The handbook warns that employees "MAY BE DISCIPLINED FOR ANY CONDUCT THAT A SUPERVISOR DETERMINES WARRANTS DISCIPLINARY ACTION," and clarifies that Misericordia retains "SOLE DISCRETION" to determine the grade of the violation. (See id. at 41). The handbook also outlines a "progressive disciplinary system," noting the system "should be followed" for any conduct that warrants disciplinary action, but permits exceptions for "unusual circumstances." (See id.; see also Doc. 39-6 at 11-15). The handbook characterizes the system as a set of "guidelines" and notes Misericordia's administrator retains the discretion to take any disciplinary measures she deems appropriate. (See Doc. 39-6 at 15).

Misericordia claims Rice-Smith "engaged in improper use of authority and insubordination" in October 2016. (See Doc. 35-5 ¶ 26). Misericordia's handbook defines insubordination as "deliberate refusal to comply with instructions issued by an authorized supervisor or disrespect, or the use of abusive or insulting language toward a supervisor." (See id. ¶ 28; Doc. 35-12 at 41). Insubordination is a Group IV

---

[2] Rice-Smith's second amended complaint alleges she "was disciplined for allegedly making a non work-related telephone call on her telephone." (See Doc. 23 ¶ 24). We therefore consider the fact of Rice-Smith's discipline, as related to personal telephone phone use, to be undisputed.

violation, and an employee who commits such violations may be "subject to immediate termination." (See Doc. 35-5 ¶ 29).  According to Misericordia, Rice-Smith "refused to let a Certified Nursing Assistant ('CNA') attend" a CPR training course Urban had mandated for all staff. (See id.)  Urban testified that he verbally counseled Rice-Smith about the incident. (See id. ¶ 30; Urban Dep. 25:9-26:9).  Rice-Smith does not dispute this incident occurred, but denies it constituted insubordination and insists she was fulfilling her job duties, including the provision of assignments to subordinate staff members. (See Doc. 39-2 ¶¶ 26-27).  Rice-Smith also maintains she was responsible for "putting patients first" and that the CPR issue impacted her responsibility to provide "adequate staffing ratios" during her shift. (See id.)

Misericordia also avers Rice-Smith improperly used the scheduling system. (See Doc. 35-5 ¶ 31).  Rice-Smith was permitted to add a staff member to the schedule when another staff member called off from work. (See id.)  Bittner testified that while the nurse secretary was responsible for scheduling, the house supervisor might get involved in the nurse secretary's absence. (See Bittner Dep. 49:24-50:8).  Rice-Smith purportedly made "scheduling changes with and for staff even when they were not calling off from work, despite having been told not to." (See Doc. 35-5 ¶ 32).  Urban orally counseled Rice-Smith about this scheduling issue, although the record does not indicate when Rice-Smith's alleged infraction occurred or when Urban counseled her. (See id. ¶ 33).  Rice-Smith asserts that she was allowed to make scheduling changes and claims she "acted within her documented job duties." (See Doc. 39-2 ¶¶ 31-33).

Misericordia posits that on or around December 5, 2016, Rice-Smith "instigated a confrontation" with Claudia Anderson, a newly hired nurse secretary. (See Doc. 35-5 ¶ 52).  Per Misericordia, Rice-Smith physically blocked Anderson from getting into her workspace and told Anderson, "in an antagonizing way," that "you can work at any computer."  (See id. ¶ 53).  Anderson reported this incident to Urban.  (See id. ¶ 54).  Rice-Smith denies a "confrontation" or "incident" occurred, and states she was taking a medication to control her multiple sclerosis, which commonly causes agitation.  (See Doc. 39-2 ¶¶ 52, 54).  Rice-Smith does not specifically deny blocking Anderson or informing Anderson she could "work at any computer," but instead claims Misericordia only provided one computer for its supervisors, and that she had "seniority over" Anderson to use it.  (See id. ¶ 53).

At unspecified times during her employment, Rice-Smith complained to Urban about a coworker and licensed practical nurse ("LPN") supervisor named Teasa Heuyard, who is Caucasian.  (See Doc. 35-5 ¶¶ 27, 34).  According to Rice-Smith, she complained to Urban because Heuyard was aggressive, callous, and crude—Heuyard "would curse like it was okay to do that."  (See id. ¶ 36; Doc. 39-2 ¶ 36; Rice-Smith Dep. 48:11-20).  Rice-Smith testified Heuyard would "challenge" her authority, and Rice-Smith was "not sure why" she was a target of Heuyard's aggression.  (See Rice-Smith Dep. 49:5-13).  Rice-Smith also recalled instances where Heuyard acted aggressively toward two Caucasian employees.  (See Doc. 35-5 ¶ 37).  She was unable to provide dates for Heuyard's aggressive acts or for her

complaints, stating it was a "conversation that [she] had continuously with" Urban. (See Rice-Smith Dep. 48:14-49:15, 51:14-17, 53:25-55:2, 57:20-59:19).[3]

Urban recommended Rice-Smith's termination to Bittner on December 8, 2016 due to Rice-Smith's "ongoing issues at work, including (1) using work time for personal matters, (2) improperly using authority, (3) instigating a confrontation with fellow employees, residents, or visitors, (4) insubordination, and (5) acting with the intent to disrupt resident care and the overall smooth operation of Misericordia." (See id. ¶¶ 56-57). Bittner approved Urban's recommendation. (See id. ¶ 58). Urban and Bittner confirmed that Misericordia terminated Rice-Smith without using its progressive discipline policy. (See Urban Dep. 42:5-43:2; Bittner Dep. 36:22-37:24). At least three additional employees were terminated without the benefit of the progressive disciplinary system, including Heuyard. (See Bittner Dep. 14:1-17:12; see also Doc. 35-11, Heuyard Dep. 28:10-17).

Urban and Bittner met with Rice-Smith on the afternoon of December 9, 2016, to inform her of her termination. (See Doc. 35-5 ¶ 62). Rice-Smith did not agree with the reasons provided for termination. (See id. ¶ 64). Rice-Smith maintains, and Misericordia denies, that Urban voiced concerns about Rice-Smith's health, specifically her multiple sclerosis, during this meeting. (See id. ¶ 66; Doc. 39-2 ¶ 66; Rice-Smith Dep. 45:16-21). Rice-Smith also proffers an affidavit from former Misericordia employee Leona Baughman, which states Baughman

---

[3] Misericordia terminated Heuyard in February 2018 for failing to follow a patient's care plan. (See Doc. 35-11, Heuyard Dep. 13:15-14:11, 16:1-11; Bittner Dep. 16:8-17:5).

"learned that Misericordia had trepidations and concerns" about Rice-Smith's multiple sclerosis and "her ability to perform her work."  (See Doc. 39-3 ¶ 10).

### D.    Procedural History

Rice-Smith filed the instant suit in August 2020.  She filed an amended complaint in October 2020, and a second amended complaint in January 2021.  Rice-Smith asserts claims for race discrimination in violation of Title VII and the PHRA (Count I); disability discrimination in violation of the ADA and PHRA (Count II); and retaliation in violation of Title VII as well as the PHRA and ADA (Count III). Misericordia now moves for summary judgment on all claims.

## II.   Legal Standard

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  FED. R. CIV. P. 56(a).  The burden of proof tasks the nonmoving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.  See Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The court is to view the evidence "in the light most favorable to the non[]moving party and draw all reasonable inferences in that party's favor."  Thomas v. Cumberland County, 749 F.3d 217, 222 (3d Cir. 2014). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the nonmoving party on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.

574, 587-89 (1986).  Only if this threshold is met may the cause of action proceed.
See Pappas, 331 F. Supp. 2d at 315.

Federal Rule of Civil Procedure 56(c) requires movants and nonmovants alike to support factual assertions by "citing to particular parts of materials in the record" or otherwise "showing that the materials cited do not establish the absence or presence of a genuine dispute."  FED. R. CIV. P. 56(c).  Rule 56(e) allows the court to deem undisputed any fact not properly countered by record evidence.  See FED. R. CIV. P. 56(e)(2).  Local Rule of Court 56.1 undergirds these principles by requiring Rule 56 motions to "be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  LOCAL RULE OF COURT 56.1.  Local Rule 56.1 further requires the nonmovant to file a responsive statement identifying genuine issues to be tried and mandates that both parties' submissions "include reference to the parts of the record that support the statements."  Id.

This court has wide discretion to sanction noncompliance with local rules, including Local Rule 56.1, which serves the important purpose of organizing the summary judgment record and facilitating efficient disposition of Rule 56 motions. See Weitzner v. Sanofi Pasteur Inc., 909 F.3d 604, 613-14 (3d Cir. 2018).  Permissible sanctions for failure to strictly comply with Local Rule 56.1 include striking nonresponsive statements of fact or deeming a moving party's statement to be unopposed when not properly controverted.  See id.; see also FED. R. CIV. P. 56(e); LOCAL RULE OF COURT 56.1.  In resolving the instant motion, the court has reviewed the parties' statements and has independently considered the entire record.

III.   **Discussion**

Rice-Smith brings claims of race discrimination, disability discrimination, and retaliation under state and federal law. Misericordia moves for summary judgment on all of the claims in Rice-Smith's second amended complaint. We therefore consider her claims *seriatim*.

   A.   **Race-Based Claims[4]**

      1.   *Discrimination*

Title VII prohibits an employer from discharging "any individual . . . because of such individual's race." <u>See</u> 42 U.S.C. § 2000e-2(a)(1). The PHRA similarly makes it unlawful for an employer to discharge an individual due to her race. <u>See</u> 43 PA. STAT. AND CONS. STAT. ANN. § 955(a).[5] Under the <u>McDonnell Douglas</u> burden-shifting standard, a Title VII plaintiff establishes a *prima facie* case of discrimination by presenting sufficient evidence that (1) she is a member of a

---

[4] The second amended complaint makes passing reference to "harassment" and "racially offensive comments." (<u>See</u> Doc. 23 ¶¶ 32, 40). To prevail under a hostile-work environment theory, a plaintiff must establish "(1) [s]he suffered intentional discrimination due to [her] [race], (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected [her], (4) the discrimination would detrimentally affect a reasonable person in like circumstances, and (5) the existence of *respondeat superior* liability." <u>See</u> <u>Mandel v. M & Q Packaging Corp.</u>, 706 F.3d 157, 167 (3d Cir. 2013) (citation omitted). Misericordia's motion seeks dismissal of all claims and argues Rice-Smith has not established any severe or pervasive conduct. (<u>See</u> Doc. 36 at 33-34). Rice-Smith's opposition brief does not mention or defend this theory. (<u>See</u> <u>generally</u> Doc. 39). We therefore consider it abandoned. <u>See</u> <u>Stauffer v. Navient Sols., LLC</u>, 241 F. Supp. 3d 517, 519 n.3 (M.D. Pa. 2017) (Conner, C.J.) (plaintiff's lack of legal support in response to dispositive motion deemed withdrawal of claim).

[5] The court reviews PHRA claims under the same standards as Title VII claims. <u>See</u> <u>Connelly v. Lane Constr. Corp.</u>, 809 F.3d 780, 791 n.8 (3d Cir. 2016) (citing <u>Goosby v. Johnson & Johnson Med., Inc.</u>, 228 F.3d 313, 317 n.3 (3d Cir. 2000)).

protected class, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) the circumstances of the adverse action give rise to an inference of discrimination.  See Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).  Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision.  See McDonnell Douglas, 411 U.S. at 802.  A plaintiff must then show that the defendant's reason for the employment decision was a mere pretext for discrimination.  See id. at 804-05.

To establish the final element of the *prima facie* case, plaintiffs may point to "comparator evidence, evidence of similar racial discrimination of other employees, or direct evidence of discrimination from statements or actions by . . . supervisors suggesting racial animus."  See Golod v. Bank of Am. Corp., 403 F. App'x 699, 703 n.2 (3d Cir. 2010) (nonprecedential) (citation omitted).  The McDonnell Douglas burden-shifting framework does not require courts "to ration the evidence between one stage or the other."  Doe v. C.A.R.S. Prot. Plus, Inc., 527 F.3d 358, 370 (3d Cir. 2008), order clarified, 543 F.3d 178 (3d Cir. 2008).  Thus, evidence can be used for both the *prima facie* and pretext portions of the framework.  See Dillon v. Coles, 746 F.2d 998, 1003 (3d Cir. 1984); see also Texas Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 256 n.10 (1981).

In the matter *sub judice*, Misericordia argues Rice-Smith cannot make out a *prima facie* of race discrimination because she was not qualified for her position and because she has not offered any evidence that gives rise to an inference of race

discrimination.  (<u>See</u> Doc. 36 at 9-13).  Rice-Smith incorrectly claims Misericordia has conceded both of these elements and therefore offers no argument to support their establishment.[6]  (<u>See</u> Doc. 39 at 6-7).  Rice-Smith argues elsewhere, however, that Misericordia "failed to follow its own progressive discipline policy" and that Heuyard made "racially suggestive comments" but was not disciplined.  (<u>See</u> Doc. <u>id.</u> at 7, 9-11).  We therefore consider whether these grounds can establish a *prima facie* case.  <u>Cf.</u> <u>Dillon</u>, 746 F.2d at 1003.

A discrepancy between an employer's *mandatory* disciplinary policy and its treatment of a plaintiff can establish the inference of discrimination.  <u>See</u> <u>Smith v. City of Allentown</u>, 589 F.3d 684, 692 (3d Cir. 2009).  Misericordia's decision to terminate Rice-Smith rather than utilize its progressive disciplinary system does not give rise to an inference of discrimination.  Principally, Rice-Smith has not properly controverted Misericordia's employee handbook, which lists insubordination as a Group IV violation, a fireable offense.  (<u>See</u> Doc. 35-5 ¶ 29; Doc. 39-2 ¶ 29).[7]  Thus, Misericordia's decision to terminate Rice-Smith, in part for insubordination, actually aligns with its stated policy.  Rice-Smith also contends she acted within the scope of her job duties, (<u>see</u> Doc. 39-2 ¶¶ 26-29), but we are mindful that courts "do not sit as a super-personnel department that reexamines an entity's

---

[6] Because we resolve Misericordia's motion based on the last element of the *prima facie* case, we need not decide whether Rice-Smith was qualified for her position under Title VII.

[7] Rice-Smith's statement of facts denies that insubordination is a Group IV violation and claims "Urban believed that insubordination was a Group 3 violation until he was coached by his attorney."  (<u>See</u> Doc. 39-2 ¶ 29).  We do not consider this denial to be responsive to the language of the handbook itself.

business decisions," see Capps v. Mondelez Glob., LLC, 847 F.3d 144, 154 n.9 (3d Cir. 2017) (citation omitted).  Thus, Rice-Smith's insistence that Misericordia should not have considered her actions insubordination is inapposite.

Even assuming *arguendo* Rice-Smith can establish that the disciplinary policy was not followed, she has failed to establish that the policy was either mandatory or followed as a matter of course.  To the contrary, Misericordia's handbook explicitly permits exceptions to the policy in "unusual circumstances," and allows the administrator discretion to take any disciplinary action she deems appropriate.  (See Doc. 39-6 at 14, 15).  Bittner testified that Misericordia also terminated two other employees without using the progressive disciplinary policy, and Heuyard stated she was terminated without progressive discipline.  (See Bittner Dep. 14:1-16:3;  Heuyard Dep. 28:10-17).  As Rice-Smith has adduced no evidence that Misericordia's policy rises beyond a set of guidelines, her *prima facie* case cannot rest on this evidence.  Cf. Smith, 589 F.3d at 692 (affirming summary judgment for employer in part because disciplinary policy was not mandatory); Emmett v. Kwik Lok Corp., 528 F. App'x 257, 262 (3d Cir. 2013) (nonprecedential) ("little can be inferred" from disciplinary policy that was neither "mandatory" nor "rigorously followed").

Rice-Smith also remonstrates that Heuyard made "racially suggestive comments" with impunity.  (See Doc. 39 at 9-11).  The problem for Rice-Smith is that the record is devoid of evidence that Heuyard ever made such comments.  *Per contra*, Rice-Smith characterized Heuyard as aggressive, callous, and crude to all coworkers.  (See Doc. 35-5 ¶ 36; Doc. 39-2 ¶ 36; Rice-Smith Dep. 48:11-20, 49:5-9).

15

Her testimony contains no suggestion Heuyard made *racist* comments—to Rice-Smith or anyone else.  It is beyond peradventure that federal antidiscrimination laws do not constitute "a general civility code," and "ordinary tribulations of the workplace" do not give rise to a claim.  See Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998); see also Fairclough v. Wawa, Inc., 412 F. App'x 465, 469 (3d Cir. 2010) (nonprecedential) (workplace personality conflicts not actionable under Title VII).  Without any record evidence indicating Heuyard made race-based comments at Misericordia, Rice-Smith's *prima facie* case fails on this ground.[8]

In sum, Rice-Smith has failed to establish a *prima facie* case of race discrimination.  She has not proffered suitable comparators, established that other employees experienced racial discrimination, or put forth evidence of racially discriminatory statements by her supervisors or coworkers.  Cf. Golod, 403 F. App'x

---

[8] Rice-Smith also makes passing reference to Heuyard as a comparator with respect to their terminations, stating Heuyard "was afforded a three-day investigation" before she was terminated, but Rice-Smith was not.  (See Doc. 39 at 13).  "[I]dentification of a similarly situated individual outside of the protected class, who engaged in the same conduct but was treated more favorably, may give rise to an inference of unlawful discrimination."  See Mandel, 706 F.3d at 170.  A comparator must be "similarly situated in all respects—in other words, dealt with the same supervisor . . . subject to the same standards, and . . . engaged in the same conduct."  See In re Trib. Media Co., 902 F.3d 384, 403 (3d Cir. 2018).  Rice-Smith and Heuyard, however, were not terminated for the same or even similar conduct, and no evidence of record indicates Misericordia conducted an official investigation into all disciplinary infractions.  Nor has Rice-Smith endeavored to establish that Heuyard is otherwise similarly situated.

at 703 n.2.  We will therefore grant Misericordia's motion for summary judgment on these claims.[9]

### 2. *Retaliation*

Title VII prohibits an employer from discriminating against an employee because she, *inter alia*, "has opposed any practice made an unlawful employment practice by this subchapter."  See 42 U.S.C. § 2000e-3(a).  The PHRA likewise forbids discrimination "against any individual because such individual has opposed any practice forbidden by this act."  43 PA. STAT. AND CONS. STAT. ANN. § 955(d).[10] To establish a *prima facie* case of retaliation under Title VII, a plaintiff must establish that (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse employment action.  See Carvalho-Grevious v. Del. State Univ., 851 F.3d 249, 257 (3d Cir. 2017) (citing Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006)).

---

[9] The second amended complaint seeks "[a]n award of punitive damages under Title VII."  (See Doc. 23 at 9).  Misericordia seeks to dismiss Rice-Smith's request for punitive damages, (see Doc. 36 at 34-35), and Rice-Smith does not acknowledge or respond to this portion of the motion, (see generally Doc. 39).  As we are granting the motion in relation to Rice-Smith's Title VII claims, Misericordia's request is moot.  To the extent Rice-Smith's second amended complaint could be construed to seek punitive damages pursuant to the ADA, she has abandoned that remedy by failing to respond to Misericordia's briefing.  See Stauffer, 241 F. Supp. 3d at 519 n.3.

[10] Our court of appeals generally applies the same analytical framework to PHRA retaliation claims as to Title VII retaliation claims.  See Connelly, 809 F.3d at 791 n.9 (citing Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997)).

Under the first prong, Title VII includes an "opposition clause" and a "participation clause."  See Slagle v. County of Clarion, 435 F.3d 262, 265-66 (3d Cir. 2006) (citing 42 U.S.C. § 2000e-3(a)); see also EEOC v. Allstate Ins. Co., 778 F.3d 444, 452 (3d Cir. 2015).  A plaintiff may be protected by the opposition clause when she "oppose[s] any practice made an unlawful employment practice" by Title VII.  See 42 U.S.C. § 2000e-3(a); see also Moore, 461 F.3d at 341.  But if "[n]o reasonable person could have believed" the conduct complained of violated Title VII, the plaintiff has not engaged in protected activity.  See id. at 341 (quoting Clark County v. Breeden, 532 U.S. 268, 271 (2001)).  Similarly, opposition of practices other than those prohibited under Title VII does not constitute protected activity.  See Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 134 (3d Cir. 2006); Rossell v. Cnty. Bank, 270 F. App'x 217, 217 (3d Cir. 2008) (nonprecedential) (citing Slagle, 435 F.3d at 262).

Misericordia argues Rice-Smith did not engage in protected activity and therefore cannot proceed on her race-based retaliation claims.  We agree.  During her employment, Rice-Smith orally complained to Urban about Heuyard, a Caucasian LPN supervisor.  (See Doc. 35-5 ¶ 34).  But there is no indication from Urban's, Heuyard's, or even Rice-Smith's testimony, that these complaints alleged or implied Rice-Smith was complaining of racially discriminatory conduct.  Rice-Smith argues in briefing that Heuyard made "racially suggestive comments" at work, (see Doc. 39 at 9-11), yet the record contains no evidence of such comments.  Instead, Rice-Smith testified that she complained to Urban because Heuyard was aggressive, callous, crude, and challenged Rice-Smith's authority.  (See Doc. 35-5

¶ 36; Doc. 39-2 ¶ 36; Rice-Smith Dep. 48:11-20, 49:5-9).  Rice-Smith stated she was "not sure why" she was a target of Heuyard's aggression, and acknowledged that Heuyard's aggression was not limited to her, as Heuyard acted aggressively toward Caucasian employees on several occasions.  (See Doc. 35-5 ¶ 37; Rice-Smith Dep. 48:14-49:15, 51:14-17, 53:25-55:2, 57:20-59:19).

In short, Rice-Smith's complaints about Heuyard's aggressive behavior do not constitute protected activity.  See Curay-Cramer, 450 F.3d at 134; Moore, 461 F.3d at 341.  No reasonable person could have understood Rice-Smith to be complaining of *racially* hostile treatment from Heuyard.  See Moore, 461 F.3d at 341.  Rice-Smith's Title VII and PHRA retaliation claims therefore fail.[11]  Rice-Smith's failure to establish that she engaged in protected activity is fatal to her retaliation claims under Title VII and the PHRA.  We will therefore grant Misericordia's motion for summary judgment on these claims.[12]

---

[11] We are similarly unpersuaded by Rice-Smith's insistence in briefing that she could have been retaliated against because she was "an advocate for" Misericordia patients.  (See Doc. 39 at 2).  Patients decidedly lack an employment relationship with Misericordia, and therefore Rice-Smith's purported advocacy for their well-being cannot constitute protected activity—it does not relate to any discriminatory *employment* practice.  See 42 U.S.C. § 2000e-3(a); see also Rossell, 270 F. App'x at 217 (employee who opposed bank's treatment of Black customers not engaged in protected activity).

[12] Misericordia also argues that Rice-Smith failed to exhaust her administrative remedies with respect to these claims.  (See Doc. 36 at 15-16).  Because we hold that Rice-Smith's claims fail at the *prima facie* stage, we do not reach this portion of Misericordia's arguments.

**B.**     **Disability Claims**

    **1.**     *Discrimination*

The ADA mandates that an employer may not "discriminate against a qualified individual on the basis of disability in regard to . . . hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  The PHRA similarly forbids discrimination on the basis of disability.  See 43 PA. STAT. AND CONS. STAT. ANN. § 955(a).[13]

To make out a *prima facie* case of discrimination under the ADA, a plaintiff must establish (1) she has a disability, (2) she is a "qualified individual," and (3) the defendant discriminated against her because of her disability.  See Furgess v. Pa. Dep't of Corr., 933 F.3d 285, 288-89 (3d Cir. 2019) (citing Chambers *ex rel.* Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 189 n.19 (3d Cir. 2009)).  The burden of establishing a *prima facie* case "is not onerous," see Doe, 527 F.3d at 365 (quoting Burdine, 450 U.S. at 253), and presents a "low bar" for employment-discrimination plaintiffs, see Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d 535, 539 (3d Cir. 2006) (citation omitted).

Misericordia challenges Rice-Smith's *prima facie* case of disability discrimination on two grounds.  Misericordia contends (1) Rice-Smith does not have

---

[13] The Third Circuit Court of Appeals applies the ADA's analytical framework to PHRA claims.  See Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 382 (3d Cir. 2002) (citing Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996)).  Our analysis herein applies with equal force to Rice-Smith's PHRA disability claim.

a disability, and (2) Rice-Smith is not a "qualified individual" within the meaning of the ADA.  We address these elements *seriatim*.

### a.    Disability Status

"Disability" under the ADA is defined as "a physical or mental impairment that substantially limits one or more major life activities" of an individual, a "record of such impairment," or "being regarded as having such an impairment."  See 42 U.S.C. § 12102(1); McFarlan v. Ivy Hill SNF, LLC, 675 F.3d 266, 274 (3d Cir. 2012).  Congress specifically intended that "disability" be interpreted broadly.  See 42 U.S.C. § 12102(4)(A).

The parties agree Rice-Smith informed Urban that she carries a diagnosis of multiple sclerosis during her July 2016 interview and requested to use a cane while working.  (See Doc. 35-5 ¶ 9).  Misericordia now contends that Rice-Smith has not established she in fact suffers from this disease, and therefore is not protected by the ADA.  (See Doc. 36 at 13-14).  We agree that the summary judgment record does not substantiate a diagnosis of multiple sclerosis.  To be clear, we express no opinion on whether Rice-Smith has this medical condition.  However, she has failed to properly oppose Misericordia's summary judgment briefing on this theory.  See Stauffer, 241 F. Supp. 3d at 519 n.3 (plaintiff's lack of legal support in response to dispositive motion deemed withdrawal of claim).  Nor has she proffered any competent evidence to establish she does in fact have multiple sclerosis.  (See Doc. 39 at 6 (incorrectly asserting Misericordia concedes disability)); see also FED. R. CIV. P. 56(c), (e); LOCAL RULE OF COURT 56.1.  Thus, Rice-Smith cannot proceed on an

actually-disabled theory, and we will grant summary judgment to Misericordia to this extent.

However, Rice-Smith does brief, and the record substantiates, an alternative theory that she was regarded by Misericordia as being disabled.  (See Doc. 39 at 19-20).  The ADA permits claims by a person "regarded as" disabled, whether or not she is actually disabled, because "Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment."  See Sch. Bd. of Nassau Cnty. v. Arline, 480 U.S. 273, 284 (1987).  A plaintiff regarded as disabled may pursue an ADA discrimination claim by establishing discrimination due to "an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."  See Eshleman v. Patrick Indus., Inc., 961 F.3d 242, 245 (3d Cir. 2020).  Based on the undisputed facts surrounding Rice-Smith's accommodation request at hiring, we conclude she has established this element of her *prima facie* case for purposes of summary judgment.

### b.   <u>Qualified Individual</u>

The ADA defines "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  See 42 U.S.C. § 12111(8).  The relevant regulations divide the "qualified individual" analysis into two prongs: *first*, "the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires," and *second*, "with or without reasonable accommodation, [the

individual] can perform the essential functions of such position." <u>See</u> 29 C.F.R.

§ 1630.2(m).  We read Misericordia's briefing to contest only the first prong of the

qualified individual analysis, as it does not discuss any essential functions of the RN

house supervisor position.  (<u>See</u> Doc. 36 at 11-13, 15).

The court uses an objective standard to determine whether a person is

qualified for her position.  <u>See</u> <u>Sempier v. Johnson & Higgins</u>, 45 F.3d 724, 729 (3d

Cir. 1995).  Subjective job criteria are more often "properly cognizable at the later

stages" of the <u>McDonnell Douglas</u> burden-shifting framework because they are

prone to abuse and "more likely to mask pretext."  <u>See</u> <u>Fowle v. C & C Cola, a Div.</u>

<u>of ITT-Cont'l Baking Co.</u>, 868 F.2d 59, 65 (3d Cir. 1989).  Thus, for purposes of a

*prima facie* case, the court merely inquires "into whether [a plaintiff] possessed the

minimal objective qualifications for the position."  <u>See</u> <u>Fowler v. AT&T, Inc.</u>, 19

F.4th 292, 303 (3d Cir. 2021); <u>see also</u> <u>Weldon v. Kraft, Inc.</u>, 896 F.2d 793, 798-99 (3d

Cir. 1990) (rejecting argument that plaintiff was not qualified because it was

"intertwined with" employer's claim that plaintiff's poor performance caused his

termination).

Misericordia summarily contends Rice-Smith was "terminated because she

was not qualified for her position."  (<u>See</u> Doc. 36 at 12).  This argument, however,

improperly collapses Rice-Smith's *prima facie* case into Misericordia's burden of

production.  <u>See</u> <u>Weldon</u>, 896 F.2d at 798-99.  Misericordia attaches an eight-page

job description for Rice-Smith's position, (<u>see</u> Doc. 35-12 at 43-50), but does not

utilize it to argue she was *objectively* unqualified for the position of RN house

supervisor, <u>cf.</u> <u>Sempier</u>, 45 F.3d at 729.  To the contrary, Urban testified he became

familiar with Rice-Smith through her work at a staffing agency, was familiar with "her job performance," and knew she obtained the "necessary training and education" to become a RN.  (See Urban Dep. 14:21-15:22, 16:15-17-5).  Heuyard and Bittner both testified Urban had previously worked with her Rice-Smith, and Bittner stated Urban was "excited" to her.  (See Heuyard Dep. 34:22-35:7; Bittner Dep. 26:7-14).  For these reasons, we conclude Rice-Smith had the "skill, experience, education and other job-related requirements" to obtain her position at Misericordia, see 29 C.F.R. § 1630.2(m), and that she "possessed the minimal objective qualifications for the position," see Fowler, 19 F.4th at 303.

### c.      Legitimate, Nondiscriminatory Reasons and Pretext

Misericordia does not address whether the circumstances of Rice-Smith's termination give rise to an inference of disability discrimination, so we assume for the purposes of summary judgment that her *prima facie* case is established.  (See generally Doc. 36 at 13-14).  If the plaintiff proves a *prima facie* case, the burden of production shifts to the employer to identify a "legitimate, nondiscriminatory reason" for its conduct.  See Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (quoting McDonnell Douglas, 411 U.S. at 802).  The defendant's burden at this stage is "'relatively light,'" and is a burden of production only.  See Burton v. Teleflex, Inc., 707 F.3d 417, 426 (3d Cir. 2013) (quoting Tomasso, 445 F.3d 702, 706 (3d Cir. 2006)).  Assuming the employer meets its burden, the burden shifts back to the plaintiff to show that the employer's stated reason is pretextual.  See Fuentes, 32 F.3d at 763.

To demonstrate pretext and defeat summary judgment, a plaintiff must identify evidence that would allow the factfinder to "(1) disbelieve the employer's articulated legitimate reasons, or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." See Fowler, 19 F.4th at 299 (quoting Walton v. Mental Health Ass'n. of Se. Pa., 168 F.3d 661, 668 (3d Cir. 1999)).  Our court of appeals has recognized that "proof of a discriminatory atmosphere may be relevant in proving pretext" because it contextualizes an employer's decisionmaking process.  See Creely v. Genesis Health Ventures, Inc., 184 F. App'x 197, 200 (3d Cir. 2006) (nonprecedential) (citing Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 546 (3d Cir. 1992)).  On the other hand, little weight is accorded to "stray remarks by non-decisionmakers," especially if those remarks are made "temporally remote from the date of decision." See Ezold, 983 F.2d at 545 (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring)).

Misericordia meets its "relatively light" burden by cataloguing Rice-Smith's disciplinary infractions.  (See Doc. 36 at 25-30).  The burden thus rebounds to Rice-Smith, and we consider whether she has adduced any evidence of pretext.  See Fuentes, 32 F.3d at 763.  We conclude that she has.  The parties dispute whether Urban informed Rice-Smith he had "concerns" about her multiple sclerosis and its impact on her work at her termination meeting.  (See Doc. 35-5 ¶ 66; Doc. 39-2 ¶ 66). They also dispute the meaning of Urban's text to Rice-Smith, sent five days before her termination, which notes: "We will talk tomorrow about how you are feeling and how to adjust your schedule to keep you healthy."  (See Doc. 35-12 at 78).

Viewed in the light most favorable to Rice-Smith, these remarks—close in time to termination—constitute circumstantial evidence that Urban's perception of Rice-Smith's multiple sclerosis wrongfully informed the decision to fire her.  See Ezold, 983 F.2d at 545, 546.  Misericordia denies Urban voiced concerns about Rice-Smith's multiple sclerosis when she was terminated, but at the summary judgment stage we make no credibility determinations, and draw all reasonable inferences in favor of Rice-Smith as the nonmovant.  See Thomas, 749 F.3d at 222.  Given the material factual disputes surrounding the circumstances of Rice-Smith's termination, we will deny summary judgment on Rice-Smith's disability discrimination claims.

### 2. *Retaliation*

The second amended complaint alleges Misericordia retaliated against Rice-Smith due to her accommodation request.  (See Doc. 23 ¶ 56).  A plaintiff must establish the following for a *prima facie* case of ADA retaliation: (1) protected activity, (2) adverse employment action, and (3) a causal connection between the protected activity and the adverse action.  See Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000) (quoting Krouse, 126 F.3d at 500).[14]  Protected activity under the ADA includes a good-faith request for accommodation.  See Sulima v. Tobyhanna Army Depot, 602 F.3d 177, 188 (3d Cir. 2010) (citing Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 191 (3d Cir. 2003)).  Our court of appeals has admonished,

---

[14] We apply the same analytical framework to PHRA retaliation claims as to ADA retaliation claims.  See Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567 (3d Cir. 2002) (citations omitted).  Our analysis with respect to Rice-Smith's ADA retaliation claim applies equally to her disability retaliation claim under the PHRA.

however, that filing a workers' compensation claim is not protected activity.  See

Lanza v. Postmaster Gen. of U.S., 570 F. App'x 236, 241 (3d Cir. 2014)

(nonprecedential) (citing Reynolds v. Am. Nat'l Red Cross, 701 F.3d 143, 154 (4th

Cir. 2012)).  Misericordia assumes Rice-Smith engaged in protected activity when

she requested to use a cane during her July 2016 interview, and challenges only the

causation element of Rice-Smith's *prima facie* case.  (See Doc. 36 at 21-25).  Rice-

Smith does not claim she engaged in any additional activity protected by the ADA,

so we limit our analysis to her initial accommodation request.  (See Doc. 39 at 12).

For retaliation claims, the timing between an employee's protected activity

and the adverse employment action may be indicative of causation if it is "unusually

suggestive of retaliatory motive."  See Shaner, 204 F.3d at 505 (citing Krouse, 126

F.3d at 503).  A "bright line rule" for unusually suggestive timing does not exist, but

"temporal proximity" alone is rarely sufficient to establish causation.  Compare Jalil

v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (two-day lapse sufficient to infer

causation) with LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 233 (3d

Cir. 2007) (inference from temporal proximity "begins to dissipate" with lapse of

three or more months); see also Shinn v. FedEx Freight, Inc., 783 F. App'x 229, 233

(3d Cir. 2019) (nonprecedential) (citing Williams v. Phila. Hous. Auth. Police Dep't,

380 F.3d 751, 760 (3d Cir. 2004) (two-month lapse, by itself, insufficient)).  The court

is not limited to considering temporal proximity, however, and a plaintiff may

establish causation by pointing to "any other evidence in the record sufficient to

support the inference of retaliatory animus."  See LeBoon, 503 F.3d at 232-33 (citing

Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279-81 (3d Cir. 2000)).

Rice-Smith requested an accommodation for her multiple sclerosis in July 2016 and was terminated in December 2016.  (See Doc. 35-5 ¶¶ 9, 65).  Due to the four-month lapse between Rice-Smith's accommodation request and termination, temporal proximity is not sufficient to establish causation.  See LeBoon, 503 F.3d at 233; Williams, 380 F.3d at 760.  After reviewing both the summary judgment record and the parties' briefing, we conclude that Rice-Smith has abandoned her ADA retaliation claim.  See Stauffer, 241 F. Supp. 3d at 519 n.3 (plaintiff's lack of legal support in response to dispositive motion deemed withdrawal of claim).  Rice-Smith does not mention or brief that she requested another accommodation, much less establish how her initial accommodation request could be causally connected to her termination.  (See Doc. 39 at 12-19).  Nor does she adduce other evidence indicative of retaliatory animus based on her July 2016 request to use a cane at work.  Cf. LeBoon, 503 F.3d at 232-33.  To the extent Rice-Smith's briefing argues her workers' compensation filing constitutes protected activity under the ADA, we are unpersuaded.  See Lanza, 570 F. App'x at 241.  Rice-Smith therefore has not established a *prima facie* case of retaliation pursuant to the ADA, and we will grant summary judgment as to this claim.

**IV.**   <u>**Conclusion**</u>

We will grant in part and deny in part Misericordia's motion for summary

judgment.  An appropriate order shall issue.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    June 21, 2022